**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 20 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

WYOMING SAWMILLS
INCORPORATED, a Wyoming
corporation,

      Plaintiff-Appellant,

v.

UNITED STATES FOREST SERVICE;
and ANN M. VENEMAN, Secretary, U.S.
Department of Agriculture; DALE N.
BOSWORTH, Chief, U.S. Forest Service;
RICK D. CABLES, Regional Forester,
Region II, U.S. Forest Service; and BILL
BASS, Supervisor, Bighorn National
Forest, all in their official capacities,

      Defendants-Appellees,

and

MEDICINE WHEEL COALITION ON
SACRED SITES OF NORTH
AMERICA,

      Defendants-Intervenors-Appellees.

No. 02-8009

NATIONAL CONGRESS OF
AMERICAN INDIANS AND
NATIONAL TRUST FOR HISTORICAL
PRESERVATION; BECKET FUND FOR
RELIGIOUS LIBERTY AND VARIOUS
CHRISTIAN, JEWISH AND MUSLIM
ORGANIZATIONS,

Amici Curiae.



---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 99-CV-0031-J)**

---

William Davis Thode, Esq., (William Perry Pendley, Esq., with him on the briefs) Mountain States Legal Foundation, Lakewood, Colorado, for Plaintiff-Appellant.

David C. Shilton, Attorney, (Kelly A. Johnson, Acting Assistant Attorney General, Environment and Natural Resources Division, Matthew H. Mead, United States Attorney, Carol A. Statkus, Assistant United States Attorney, E. Anne Peterson, Attorney, with him on the brief) United States Department of Justice, Washington, D.C., for Defendants-Appellees.

Jack F. Trope, (Andy Baldwin, Baldwin & Crocker, P.C., Lander, Wyoming, with him on the brief) Association on American Indian Affairs, Rockville, Maryland, for Intervenor-Appellee.

Steven J. Gunn, Jerome N. Frank Legal Services Org., New Haven, Connecticut, Walter R. Echo-Hawk, Jr. and Steven C. Moore, Native American Rights Fund, Boulder, Colorado, and Paul W. Edmondson, Elizabeth S. Merritt, and Anita C. Canovas, National Trust for Historic Preservation, Washington, D.C., filed an Amicus Curiae Brief for National Congress of American Indians and National Trust for Historical Preservation in support of Appellees.

Anthony Picarello, Roman Storzer, and Derek L. Gaubatz, The Becket Fund for Religious Liberty, Washington, D.C., and Robert L. Greene, The Law Offices of Robert L. Greene, New York, New York, filed an Amicus Curiae Brief for The Becket Fund for Religious Liberty, in support of appellees.

---

Before **HENRY, HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

_____

Plaintiff-appellant Wyoming Sawmills Incorporated brings this appeal from the district court's order dismissing plaintiff's claim of violation of the Constitution's Establishment Clause and holding against plaintiff on the merits of its claims of violation of the National Forest Management Act.[1]  Plaintiff commenced this action in the district court after the United States Forest Service had rejected plaintiff's challenges to the Historic Preservation Plan issued by the Forest Service for the management of the Medicine Wheel National Historic Landmark and Vicinity.  Named as defendants in the complaint were the Forest Service, the Secretary of Agriculture (who is the cabinet officer with authority over the Forest Service), and three individual officers of the Service, all of whom will be referred to herein as the Forest Service or just the Service.  The Medicine Wheel Coalition on Sacred Sites of North America was permitted to intervene in the district court and is aligned with the Service as an appellee in this court.

**I**

The Medicine Wheel National Historic Landmark was created in 1969 to preserve the Medicine Wheel, a prehistoric stone circle about 80 feet in diameter that was constructed by the aboriginal peoples of North America.  The wheel includes a large cairn in the center and

_____

[1]The district court's opinion is published at 179 F.Supp.2d 1279 (D. Wyo. 2001), and includes a more detailed description of the background of the litigation.

28 radiating spokes of rocks. Although the age of the structure is unknown, archeological evidence indicates that human presence in the area goes back for 7,500 years or more. Many tepee rings, trails, and other artifacts and traces of human habitation are found in the vicinity. A number of Native American tribes consider the Wheel to be sacred.

The Medicine Wheel is located on Medicine Mountain in the Bighorn National Forest in north central Wyoming. In 1957, approximately 200 acres in the Bighorn National Forest were set aside for the preservation of the Wheel, and designation as a National Historic Landmark followed twelve years later. In the 1980s, the Forest Service began to reconsider the level of protection afforded the area. An increase in the number of visitors to the monument had raised concerns of visitor safety and concern that the features and artifacts were at risk. On the other hand, apparently some officials were of the view that the flow of visitors should be facilitated.

In 1991, the process resulted in the publication of a Draft Environmental Impact Statement (DEIS) which set out management alternatives. The preferred alternative set out in the DEIS called for road construction and improvements to allow unrestricted vehicular access except during times of ceremonial use of the Wheel, construction of an enlarged parking lot adjacent to the Wheel, and so forth. The Forest Service received more than 300 comments on the DEIS, many of which were critical and called for an approach more sensitive to the concerns of Native Americans.

In response, the Service withdrew the proposal and began a more intensive

consultation process with the Wyoming State Historic preservation Officer and the federal Advisory Council on Historic Preservation.[2] The Big Horn County Commissioners, the Medicine Wheel Coalition on Sacred Sites of North America, the Medicine Wheel Alliance, and the Federal Aviation Administration[3] also became "Consulting Parties" in the development of plans for management of the site. The Consulting Parties entered into a Memorandum of Agreement (MOA) which established that "the management priorities for management for the Medicine Wheel are its protection and continued traditional cultural use consistent with Section 110(f) of the [National Historic Preservation] Act." I Aplt. App. 91.

The Consulting Parties comprised a committee for planning management of the site. Plaintiff notes that no representative of commercial interests was involved in this process. The Forest Service agreed in the MOA to close a portion of Forest Development Road (FDR) 12, which provides access to the Medicine Wheel; an exemption to the closing was made for the "special needs of traditional religious practitioners" to reach the site. (As will be seen, the alleged impact on logging of the decision to close FDR 12 is important to plaintiff's action). The term of the MOA appears to have been quite brief; it apparently was executed in mid-1993 and provided that it was to expire on January 1, 1994.

On August 29, 1994, the Forest Service published a Programmatic Agreement with the Consulting Parties, the stated purpose of which was to develop a plan for the long term

---

[2]The Service is required to consult with other federal, state, and local agencies and Indian tribes by the National Historic Preservation Act, 16 U.S.C. § 470h-2(a)(2).

[3]The FAA was involved because it has operated a radar site on the mountain since 1962.

management of the Medicine Wheel and Medicine Mountain. As part of this agreement, the Service prohibited, temporarily, any new "undertakings" in an area within 2.5 miles of the Medicine Wheel, including any new mining or timber harvesting, until the anticipated Historic Preservation Plan could be completed and adopted.

In September 1996, the Service adopted the long-term plan now at issue, titled the Historic Preservation Plan for the Medicine Wheel National Historic Landmark and Medicine Mountain (the HPP). The Service implemented the HPP on October 7, 1996, by issuing Amendment 12 to the Bighorn National Forest Plan;[4] Amendment 12 included a "Decision Notice and Finding of No Significant Impact," and Environmental Assessment. III Aplt. App. 573 *et seq.*

The HPP provides that the Forest Service will consult with the other parties to the HPP for any project within an "Area of Consultation" around the monument. The "Area of Consultation" is considerably larger than the National Historic Landmark, covering an estimated 18,000 to 20,000 acres. The purpose of the consultation envisioned by the HPP is to facilitate the consideration of means to minimize impacts to historic resources and traditional cultural use.

The HPP recognizes explicitly that the cultural and historic importance of the Medicine Wheel is, for many Native Americans, an element of their religious tradition.

---

[4]A forest plan, or land and resource management plan, is a planning document that guides natural resource management activities in a national forest over a period of ten years or more. *See* 16 U.S.C. § 1604.

Indeed, plaintiff points to the fact that the first page of each of the nine major sections of the HPP includes this statement: "The purpose of this HPP is to ensure that the Medicine Wheel and Medicine Mountain are managed in a manner that protects the integrity of the site as a sacred site and a nationally important traditional cultural property." *E.g.*, II Aplt. App. 263.

The Forest Service points out that preservation of the Medicine Wheel is consistent with the Service's responsibilities under a number of statutes. The Environmental Assessment produced to evaluate the environmental effects of the HPP recites:

> The Forest Service is required by law to protect and preserve National Historic Landmarks and historic properties. These laws include the Antiquities Act of 1906, the Historic Sites Act of 1935, the National Historic Preservation Act of 1966, the Archaeological and Historic Resources Preservation Act of 1974, the American Indian Religious Freedom Act of 1978, the Archaeological Resources Act of 1979 (all as amended). In addition, Executive Order No. 13007 signed by President Clinton, May 24, 1996, orders Federal agencies to accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and avoid adversely affecting the physical integrity of such sacred sites.

III Aplt. App. 582.

Plaintiff Wyoming Sawmills is a commercial timber company located in Sheridan County, Wyoming. It has been the primary purchaser of timber from the Bighorn National Forest for over 30 years. In addition to challenging the HPP, plaintiff's complaint also addressed the Forest Service's decision not to hold one particular timber sale that it had proposed. The Service had, in September 1997, advertised for bidding on a timber sale in an area referred to as Horse Creek. The Service canceled the sale after receiving bids but before opening the bids, citing a "procedural error" in having failed to consult formally with

the parties to the HPP. Internal documents indicated that the Service planned to re-advertise the sale and to proceed with it. However, after consulting with the other parties to the HPP and after further deliberations, the Service identified several potential problems with the proposed sale, including "process violations, conflicting data, and incomplete [National Environmental Policy Act] analysis." As a result, the Service never conducted a sale of timber from the Horse Creek area; on the other hand, the Service did not decide to permanently cancel the project.

## II

The Forest Service and intervenor defendant Coalition moved to dismiss the complaint, and alternatively moved for judgment as a matter of law. As relevant to this appeal, the district court addressed issues of standing for plaintiff's First Amendment claim and addressed on its merits plaintiff's claim of violation of the National Forest Management Act.

The district court concluded that plaintiff did not have standing to bring its First Amendment claims. We discuss below the concept of standing generally and the elements of standing that the judge found were satisfied. The judge held that plaintiff lacked standing as to the First Amendment claims because the court could not remedy the constitutional wrongs plaintiff had alleged. The judge first determined that the legal harm suffered was, essentially, the loss of the opportunity to bid on timber sales, an injury which flowed from the decision to close FDR 12, to withdraw the Horse Creek timber sale, and other restrictions

put in place by the HPP. The judge concluded that this injury could not be redressed because, even if the HPP were declared constitutionally invalid, the Forest Service would still be under no obligation to sell any timber from the Area of Consultation. The judge cited *Mount Evans Co. v. Madigan*, 14 F.3d 1444 (10th Cir. 1994); *Wyoming v. Lujan*, 969 F.2d 877 (10th Cir. 1992); *Ash Creek Mining Co. v. Lujan*, 969 F.2d 868 (10th Cir. 1992); and *Baca v. King*, 92 F.3d 1031 (10th Cir. 1996).

The district judge then considered plaintiff's claim that the Forest Service had violated its own regulations and the National Forest Management Act (NFMA) in adopting the HPP by means of Amendment 12 to the Forest Management Plan. After concluding that the plaintiff had established standing to advance that claim, the judge ruled against the plaintiff on the merits. The gist of the district court's ruling on this claim is that the procedural protections which plaintiff had invoked were not, in fact, required because Amendment 12 was not a "significant" alteration of the Forest Management Plan.[5]

### III

### A

We review *de novo* the district court's determination that plaintiff lacked standing to pursue its First Amendment claims. *See Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994).

---

[5]The district court also held that the plaintiff lacked standing to bring the claim alleged in the complaint under the National Environmental Policy Act, and ruled against plaintiff on the merits of its claim under the Federal Advisory Committee Act. Plaintiff has not appealed these holdings of the district court.

> [T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of – . . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted). The burden is on the plaintiff, as the party asserting jurisdiction, to establish these elements. *Id.* at 561. Further, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

The district court held that plaintiff had met its burden at the pleading stage of showing an injury in fact because plaintiff had pleaded that it had lost the right to bid on timber contracts as a result of the adoption of the HPP. The complaint also alleges that this deprivation of opportunity was a constitutional injury because it was based on the Service's decision to manage Medicine Mountain as a sacred site in violation of the First Amendment's Establishment Clause. Plaintiff asserts on appeal that the district court was correct in this determination but that the court erred in rejecting plaintiff's argument that it also was injured because it was "directly affected" by the management of Medicine Mountain as a sacred site.[6] We address this latter point first.

---

[6]In the district court plaintiff also claimed other injuries, but its appellate contentions are limited to the two alleged injuries stated in the text.

**B**

Plaintiff contends that it has standing to complain of the alleged violation of the Establishment Clause – independent of the alleged loss of opportunity to bid on timber sales, which is discussed *infra* – because it is "directly affected" by the Service's adoption of the HPP, representing the decision to manage Medicine Mountain as a sacred site. Plaintiff relies on *Abbington School Dist. v. Schempp*, 374 U.S. 203, 224 n.9 (1963), and its progeny, including two cases from this court, *Robinson v. City of Edmond*, 68 F.3d 1226 (10th Cir. 1995), and *Foremaster v. City of St. George*, 882 F.2d 1485, 1489 (10th Cir. 1989).

The Forest Service, in its brief, expresses doubt as to whether a for-profit corporation can sustain a non-economic injury under the Establishment Clause. Whatever the answer to that question may be, we conclude that this plaintiff has not alleged such an injury. In its attempt to explain how it has been directly affected, plaintiff repeatedly refers to the alleged restrictions on timber cutting which it says will follow from the HPP. Plaintiff asserts that it is directly affected "by the loss of the right to have federal land classified consistently with the Establishment Clause and the loss of the opportunity to bid for timber contracts." Plaintiff-Appellant's Opening Brief at 20. Similarly, plaintiff says that it "directed its complaint against . . . the decision of the Forest Service to close 50,000 acres . . . to timber harvesting" as a result of the adoption of the HPP. *Id*. at 21, n.8. Elsewhere, plaintiff very similarly asserts that "the lost opportunity to bid demonstrates that Wyoming Sawmills is 'directly affected' by the HPP and therefore has standing." Plaintiff-Appellant's Reply Brief

at 4.

We discern no allegation of cognizable injury separate from the alleged loss of opportunity for profitable logging. Plaintiff's invocation of such religious symbolism cases as *Foremaster* is unpersuasive. As an artificial person, plaintiff has not shown how it experienced the kind of constitutional injury that has been found in such cases. Instead, its arguments repeatedly refer to and rely on the alleged economic injury. We therefore conclude that plaintiff's claim for standing must turn on the alleged economic injury of the loss of opportunity for logging, to which we now turn.

**C**

We consider here the question whether plaintiff has suffered an economic injury. The district judge held that the loss of the opportunity to bid on future timber sales was an injury in fact sufficient to satisfy the first prong of the standing analysis and that the injury was caused by the defendant's conduct. On appeal, the Forest Service argues, as an alternative ground for affirming the judgment below, that plaintiff has not pleaded an injury in fact. We have previously observed that "each of the three standing elements blends into the others," *Ash Creek Mining Co. v. Lujan*, 969 F.2d 868, 875 (10th Cir. 1992), and we think that the district judge cannot be faulted for his holding that the plaintiff's attempt to establish standing faltered at the third requirement rather than the first. In previous cases we have applied the standing analysis in this manner, and the district judge faithfully applied our precedents.

In *Ash Creek* the plaintiff was a coal mining company which desired to bid for leases in an area under federal control. The Secretary of the Interior had decided to remove the tract from competitive coal leasing so that the tract could be used in a property exchange. The plaintiff's attempt to prevent the exchange had previously been rejected on the basis that there was no final agency action. The exchange was effected and the plaintiff again brought a legal challenge. We held that the loss of the possibility of obtaining a federal lease for coal mining was an "injury not redressable by a favorable decision" and so did not give the plaintiff standing to object to the exchange of lands. 969 F.2d at 874. Indeed, we considered the issue so clear cut that we noted "detailed discussion" was not necessary. *Id. See also Wyoming v. Lujan*, 969 F.2d 877, 880-82 (10th Cir. 1992).

In *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1451 (10th Cir. 1994), we similarly held that plaintiffs who merely hoped to obtain a contractual benefit, but who had no entitlement to the benefit, lacked standing "because their injuries are not redressable by a favorable decision." Plaintiffs in that case had previously held the right to operate the Crest House on top of Mount Evans, a facility that provided food and souvenir sales, among other services. The Crest House had been destroyed by fire, and the Forest Service had decided not to rebuild on the summit. Plaintiffs filed suit to challenge that decision. They argued that a decision in their favor would require the Service to rebuild, which would give them the opportunity to compete for the concession contract. Citing *Ash Creek*, we rejected this argument, noting that even if a new facility were to be built as plaintiffs desired, there was

"no guarantee" that plaintiffs would be the successful bidder for the concession contract and that no court could order the Service to award them the contract. *Id.*

We cited *Ash Creek* and *Mount Evans* with approval in *Baca v. King*, 92 F.3d 1031, 1036-37 (10th Cir. 1996), in which we held that the plaintiff's alleged injuries were not redressable because the only two actions that would remedy the alleged wrongs were an order for the government to sell the disputed land to the plaintiff or an order compelling the government to renew the plaintiff's grazing permit, neither of which were within the power of the courts to impose because either action was completely within the discretion of the Secretary of the Interior.

Plaintiff's arguments on this issue are not persuasive. Plaintiff contends that the wrongful denial of the opportunity to bid competitively for federal contracts is a sufficient basis for standing, citing *Aderand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995). Plaintiff misstates the holding of that case. *Aderand* involved a federal program in which contractors were given financial incentives to hire subcontractors controlled by "socially and economically disadvantaged individuals," with "race-based presumptions" included in the process for identifying such subcontractors. 515 U.S. at 204. The Court said that the "injury in cases of this kind is that a 'discriminatory classification prevent[s] the plaintiff from competing on an equal footing.'" *Id*. at 211 (quoting *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 667 (1993)). For this type of case, the Court said, "the aggrieved party 'need not allege that he would have obtained the

benefit but for the barrier in order to establish standing.'" *Id.* (quoting *Jacksonville*, 508 U.S. at 666). Plaintiff Wyoming Sawmills has not alleged that it was treated differently from any other timber company. *Aderand* is thus inapposite.

Plaintiff asserts that *Bryant v. Yellen*, 447 U.S. 352, 366-68 (1980), stands for the proposition that standing is established if the plaintiff seeks to bid for property that "might become available." But again, we find that plaintiff has stated the holding of the case in overly general terms and that the holding does not support plaintiff's claim for standing in this matter. The facts of that case are not at all analogous to the facts before this court and are rather unusual and complicated, but it is sufficient to say that the plaintiffs in that case sought to purchase lands that the Court held would "likely" become available if the plaintiffs prevailed. Wyoming Sawmills has not shown that a timber lease would "likely" become available on the lands within the area of consultation if plaintiff were to have the HPP set aside. As in *Baca*, the federal agency has complete discretion as to whether to offer the opportunity sought by the plaintiff, and accordingly the courts do not have the power to grant the only relief that would rectify the alleged injury.

Plaintiff similarly contends that the loss of an opportunity to bid was held sufficient to confer standing in *Watt v. Energy Action Educational Foundation*, 454 U.S. 151 (1981). Again, we disagree with plaintiff's characterization of the holding of the case. In *Watt*, the Court noted that the State of California claimed standing on two grounds – first, as an "involuntary 'partner'" with the Federal Government in oil and gas leasing, and second, as

a competitor with the Federal Government in the same endeavor. The Court held that California had standing on the first basis and did not consider the second claim of standing, contrary to Wyoming Sawmills' description of the case. Wyoming Sawmills does not claim to be an "involuntary partner" with the Forest Service, and its argument is not supported by *Watt*.

Wyoming Sawmills also relies on *Arkla Exploration Company v. Texas Oil & Gas Corp.*, 734 F.2d 347 (8th Cir. 1984). Of course, we are bound by our precedents, discussed *supra*, and so would not be free to follow *Arkla* if it supported plaintiff's argument, but we also note that the case is distinguishable. The plaintiff in that case sought the right to bid on lands which had been offered. 734 F.2d at 353-54.[7]

We therefore affirm the district court's holding that plaintiff Wyoming Sawmills does not have standing to bring its First Amendment claim.

**IV**

**A**

In its complaint, plaintiff alleged that Amendment 12 to the Bighorn Forest Plan (the mechanism by which the HPP was implemented) was a *de facto* change in the designation of lands within the Area of Consultation which were previously designated as suitable for

---

[7]In its reply brief, plaintiff cites two cases which do support its argument, *Wyoming Timber Industry Ass'n v. United States Forest Service*, 80 F.Supp.2d 1245 (D. Wyo. 2000), and *Mountain States Legal Foundation v. Glickman*, 92 F.3d 1228, 1233 (D.C. Cir. 1996), but we are, of course, bound by our precedents. We note that our position is consistent with that of another circuit in a case relied on by the Forest Service, *Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800, 808-09 (11th Cir. 1993).

wood fiber production (*i.e.*, logging).[8] Plaintiff alleged, and argues on appeal, that the Forest Service failed to inquire into and disclose the effects of the HPP when it solicited public comment on the HPP. Plaintiff also maintains that the Service failed to follow its own Forest Service Handbook standards for amending the Forest Plan, in violation of the Administrative Procedures Act (APA).

The district court first found that plaintiff had standing to assert this claim. 179 F.Supp.2d at 1297-98. The judge noted that, because the NFMA does not provide for judicial review of decisions by the Forest Service, the general provisions of the APA apply. Under the APA, a person "suffering legal wrong because of agency action" may obtain judicial review. 5 U.S.C. § 701. The Forest Service did not dispute that the HPP and Amendment 12 were final agency actions, nor that timber interests are within the zone of interests protected or regulated by the NFMA. The judge then noted that the standing requirement of redressability is applied less strictly when, as with this claim, a party is seeking to enforce a "procedural right." *See id.* at 1298 (citing and quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992)).

The intervenor-appellee, Medicine Wheel Coalition on Sacred Sites of North America, challenges plaintiff's standing to bring its claim under the NFMA, although the Forest Service does not contest the district court's ruling on this point. We see no error in the district court's holding on this point, however, and proceed to review the merits.

---

[8]Plaintiff alleged that a *de facto* change of designation was also imposed on some areas outside the Area of Consultation which were serviced by FDR 11.

**B**

Our standard of review is a deferential one, and we will reverse the Forest Service's action only if it is "'arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence.'" *Citizens' Committee To Save Our Canyons v. United States Forest Service*, 297 F.3d 1012, 1021 (10th Cir. 2002) (quoting *Hoyl v. Babbitt*, 129 F.3d 1377, 1382 (10th Cir. 1997)). No deference is due to the district court's decision in review of the agency's action, however. *Id*.

The National Forest Management Act (NFMA) provides that once enacted, forest plans may "be amended in any manner whatsoever." 16 U.S.C. § 1604(f)(4). As we explained in some detail two years ago, if

> an amendment to a forest plan would be "significant," however, then NFMA mandates substantial public involvement, planning, and input, requiring, in essence, the Forest Service "to conduct the same complex planning process applicable to promulgation of the original plan." *Sierra Club v. Cargill*, 11 F.3d 1545, 1551 (10th Cir. 1993) (Seymour, J., dissenting); *see* 36 C.F.R. § 219.10(f). Among other things, for significant amendments, NFMA requires the Forest Service to "mak[e] plans or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption." 16 U.S.C. § 1604(d).

*Citizens' Committee*, 297 F.3d at 1032-33 (footnote omitted). We have noted before that the Act does not provide guidance as to what amendments are "significant." *Cargill*, 11 F.3d at 1548.

> Indeed, applicable regulations "expressly commend[ ] the determination of the significance of an amendment to the Forest Supervisor's judgment." *Id*.

-18-

According to the regulations, "Based on an analysis of the objectives, guidelines, and other contents of the forest plan, the *Forest Supervisor shall determine* whether a proposed amendment would result in a significant change in the plan." 36 C.F.R. § 219.10(f) (emphasis added). If the Forest Supervisor concludes that an amendment is nonsignificant, "[he] may implement the amendment following *appropriate public notification* and satisfactory completion of [National Environmental Policy Act] procedures." *Id.* (emphasis added).

*Citizens Committee*, 297 F.3d at 1033.

In the absence of specific direction from Congress, the Forest Service has adopted guidelines in its Forest Service Handbook (FSH) for consideration of the significance of amendments to a forest plan:

Although the Forest Supervisor has wide discretion in deciding whether an amendment is significant, the FSH outlines factors the Supervisor must consider when assessing the significance of a proposed amendment, including 1) the timing of the proposed change relative to the expiration or next scheduled revision of the Forest Plan (the shorter the remaining life of the plan, the less significant the amendment); 2) "the location and size of the area involved in the change" in comparison to the "overall planning area"; 3) the long-term significance of the project relative to the goals and objectives of the forest plan; and 4) the impact of the amendment on "management prescription" – whether the change applies only to a specific situation or whether it likely will affect future decisions as well. FSH 1909.12 § 5.32(3)(a)-(d).

*Id.* (footnote omitted). In this appeal, plaintiff accepts these criteria and frames its arguments in their terms. Accordingly, our review will also focus on these factors.

Although as explained we review the agency's decision deferentially but without deference to the district court's holdings, in this instance we see no error in the district court's analysis. The first factor set out above from the FSH is the timing of the amendment. On this point, Wyoming Sawmills does not challenge the district court's observation that the

amendment came late in the planning period, after the period's first decade. Nor does Wyoming Sawmills dispute the conclusion that this factor favors a finding that the amendment was not significant.

Wyoming Sawmills does contest the agency's, and district court's, conclusion on the second factor, the size of the affected area compared to the overall planning area. The district court agreed with the agency that the size of the affected area is relatively small, observing that the Area of Consultation is only 18,000 acres or only 1.6% of the Bighorn National Forest. Plaintiff disputes this conclusion by asserting that it is improper to use the entire forest in the comparison and by contending that Amendment 12 in fact affects much more than 18,000 acres.

First, plaintiff contends that the overall planning area which should be used to determine the relative significance of the affected area should not be the entire forest but only the slightly more than 200,000 acres that are deemed "available" for timber management. But plaintiff offers neither reason nor authority to persuade us that the Service abused its discretion in using the acreage of the entire forest in its analysis. The deference owed to the Service does not permit us to find an abuse of discretion on this point.

Plaintiff emphatically contends that the decision to implement the HPP will affect an area much greater than the 18,000 acre Area of Consultation. Plaintiff bases this contention on the assertion that the decision to close FDR 12 and to bar the use of other roads passing through the Area of Consultation effectively closes an additional 30,000 acres of the forest

north and west of the Area of Consultation.

The Forest Service and the intervenor Coalition offer several points in response that severely undercut the impact of plaintiff's argument. First, we note that plaintiff has not explained how it has determined that an additional 30,000 acres are affected. Second, the district court observed that plaintiff had not shown that FDR 12 had ever been used for timber hauling; plaintiff has not countered this point. Third, the Forest Service stated expressly in the HPP that it would "continue to explore opportunities for alternative access to National Forest System lands north of the Medicine Wheel," an effort which it described as the "long term goal" of its management efforts. II Aplt. App. 318. Perhaps most significantly, the Service determined that implementation of the HPP "will not result in significant changes to those levels of outputs projected under the current Bighorn National Forest Plan." III Aplt. App. 626.[9]

The HPP does not prohibit logging in the Area of Consultation. At least two roads within the consultation area are not barred to timber hauling, although the HPP does require a consultation process for approval of their use. *Id.* at 571. More generally, Amendment 12 did not change any actual management allocations (for timber or livestock grazing, for example) but added standards and guidelines to be followed in pursuit of the existing allocations. Of the 18,000 acres in the Area of Consultation, only about ten per cent was deemed suitable for timber production. *Id.* at 347.

---

[9]We note that the withdrawal of the Horse Creek timber sale was not a final agency action; accordingly, that decision may not be reviewed at this time.

As we have noted, the third factor is the long-term significance of the project relative to the goals and objectives of the forest plan. Plaintiff's inability to convince us that the Forest Service abused its discretion in its determination of the size of the area involved is doubly important because its argument on the third factor rests entirely on the premise that the decision does affect a much larger area than just the Area of Consultation. Similarly, plaintiff's argument on the fourth factor is based largely on the same assertions. In view of the deference due to the Service's determination, we hold that plaintiff has failed to show that the Service abused its considerable discretion in finding that Amendment 12 was not a "significant" change to the overall forest plan.

This holding disposes of plaintiff's NFMA claim. Plaintiff's allegations of deprivation of procedural rights are all dependent on the more stringent procedural requirements applicable to significant amendments.

**Conclusion**

The judgment of the district court is AFFIRMED.